# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA R. RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 1:13cv0081 AGF |
| | ) | TCM |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security ("Commissioner"), denying the applications of Christina Ray ("Plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b.

Ms. Ray has filed an opening brief and a reply brief in support of her complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB and SSI in July 2010, alleging she was disabled as of March 15, 2010, because of multicystic kidney disease and headaches. (R.[1] at 171-78, 202.) Her applications were denied initially and following a hearing held in March 2012[2] before Administrative Law Judge ("ALJ") Dina R. Loewy. (Id. at 7-21, 39-79, 81-87.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Elizabeth Clem, M.R.C., C.R.C.,[3] testified at the administrative hearing.

Plaintiff was thirty-seven years old at the time of the hearing. (Id. at 43.) She is 5 feet 2 inches tall and weighs 139 pounds. (Id. at 44.) She is right-handed. (Id.) Plaintiff is not married. (Id.) She has five children, ranging in ages from ten to twenty-one years. (Id.) Two of the five, ages eleven and ten, live with her. (Id.) She completed the ninth grade, and does not have a General Equivalency Degree ("GED"). (Id. at 45.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

[2]A hearing was convened in October 2011 but was continued to allow for a psychological evaluation of Plaintiff.

[3]"M.R.C." is a Masters of Rehabilitation Counseling; "C.R.C." is a Certified Rehabilitation Counselor.

Plaintiff has an attendant through Disabled Citizens Alliance who helps her every day for two hours and fifteen minutes. (Id.) She explained she needs help sweeping and mopping her floors, fixing supper, and being reminded to take her medications. (Id. at 52.) Asked about her difficulty remembering to take her medications, Plaintiff replied that she has memory problems and forgets "a lot of things." (Id. at 53.)

Plaintiff stopped working in approximately 2009. (Id. at 46.) She last worked for Gibbs Healthcare for six months as a certified nurse aide ("CNA"). (Id. at 47.) Before that she worked as a CNA at a nursing home. (Id. at 48.) She has also worked as an in-home healthcare worker. (Id.) She stopped working because she could no longer lift people, her legs were giving out, her side was hurting, and she "was getting really sleepy." (Id. at 49.) She was told that she has kidney stones, but cannot afford to see a urologist. (Id.) She also has been treated for cancer and had part of her liver, a kidney, and part of her lung removed. (Id. at 50.) Subsequent computerized tomography ("CT") scans have been negative for a reoccurrence of the cancer. (Id. at 66.) She has asthma and uses an inhaler. (Id. at 50-51.)

Asked what she does during the day, Plaintiff replied that she "mainly sleep[s]." (Id. at 51.) She has been told she has fibromyalgia, for which she takes muscle relaxers. (Id. at 49, 50.)

Plaintiff testified that she has one friend and has a boyfriend, a police officer. (Id. at 55.) She does not watch much television and does not read. (Id.) She goes to the grocery store once a month. (Id.) She has a driver's license and a car, but, with the exception of the monthly shopping trip, her attendant drives her. (Id. at 55-56.) She smokes a pack of

cigarettes a day.  (Id. at 56.)  She does not drink.  (Id.)  Her attendant had encouraged her to be a Boy Scout leader.  (Id. at 68.)  She went to a couple of monthly meetings, but stopped going because her legs would hurt and she would have to sit down.  (Id. at 69.)

Asked why she is unable to work, Plaintiff explained that her side "hurts really, really bad" and her lower back, legs, and arms hurt.  (Id. at 59.)  Also, she has headaches four times a week and has to cover her head with a pillow.  (Id. at 59-60.)  She sometimes sees double or little black spots.  (Id. at 60.)  She has muscle spasms in the back of her legs down to her feet and in her arms and side.  (Id. at 67-68.)  The side, leg, and low back pain and the headaches started after her kidney surgery.  (Id. at 60-61.)  She told her surgeon, Dr. Weinstein, about her symptoms but he did not say anything.  (Id. at 61-62.)

Plaintiff does not have any side effects from her medications.  (Id. at 63.)  Her medications include trazodone for depression.  (Id.)

Plaintiff testified that she can lift at most a gallon of milk and can stand or walk for thirty minutes before her legs start hurting and causing her to fall.  (Id. at 64.)  She prefers not to walk up a flight of stairs.  (Id. at 65.)  She showers once a week, usually when she has to go somewhere.  (Id. at 69.)  She cries at night three or four times a week for approximately thirty minutes each time.  (Id. at 69-70.)

Ms. Clem, testifying without objection as a vocational expert ("VE"), was asked to assume a claimant who can perform medium work with additional limitations of needing to avoid concentrated exposure to temperature extremes, humidity, irritants, unprotected heights, and hazardous machinery and of being restricted to "simple routine tasks with only occasional

decision making or only occasional changes in the work setting." (Id. at 72-73.) She testified

that this claimant can return to Plaintiff's past relevant work as an unskilled cashier. (Id. at

73.) She can also work as a fast food worker, which is unskilled and light with a specific

vocational preparation ("SVP") level of two[4] and which exists in significant numbers in the

state and national economies, and as a cafeteria worker, which has the same characteristics

as the fast food worker. (Id. at 73-74.) Both jobs would still be available if the hypothetical

claimant is limited to light work. (Id. at 74.)

If the claimant is limited to sedentary work, she can work as an assembler, which is

unskilled with a SVP level of two, or as an inspector, also unskilled. (Id. at 74-75.) Both

these jobs exist in significant numbers in the state and national economies. (Id.)

If the claimant is further limited to only occasionally pushing and pulling and reaching

overhead, the jobs would remain. (Id. at 75.) If, because of "severe pain and other

impairments," the person can not "keep up to engage in sustained work activity for a full

eight-hour workday on a regular consistent basis" and needs to take additional, frequent

breaks, the jobs would not be available. (Id. at 75-76.) If the claimant can stand for only

three hours during an eight-hour day, sit for a maximum of four hours, and needs to recline

up to three times a day for thirty minutes each, no jobs would be available. (Id. at 77.)

---

[4]"The SVP level listed for each occupation in the [*Dictionary of Occupational Titles*] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

Ms. Clem stated that her testimony does not conflict with the DOT.  (Id. at 76.)

**Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her physical and mental abilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report, disclosing that her impairments prevented her from working on May 30, 2010.  (Id. at 202.)

Plaintiff also completed a Function Report.  (Id. at 231-38.)  Asked to describe what she does during the day, she replied that she takes a bath, tells her children to get up, tries to clean and, if able, fixes supper and drives to visit her mother.  (Id. at 231.)  Her pain affects her sleep.  (Id. at 232.)  She has no problems with personal care tasks, including bathing.  (Id.)  She sometimes needs to be reminded to take her medications.  (Id. at 233.)  She prepares a meal four times a week; each takes her an hour and forty-five minutes.  (Id.)  She folds clothes and, sometimes, sweeps, mops, and vacuums.  (Id.)  These chores take her all day.  (Id.)  Her children do the chores she cannot.  (Id. at 234.)  She shops for food two times a month, for two hours each time.  (Id.)  Her hobbies include crocheting and reading.  (Id. at 235.)  She does each two times a week.  (Id.)  Three times a week, she visits with people.  (Id.)  Her impairments adversely affect her abilities to lift, stand, walk, and remember.  (Id. at 236.)  They do not affect her abilities to squat, bend, reach, sit, kneel, complete tasks, concentrate, use her hands, follow instructions, or get along with others.  (Id.)  She can walk half a block before having to stop and rest.  (Id.)  She can pay attention for ninety minutes.

(Id.) She does not finish what she starts, but can follow written or spoken instructions. (Id.) She does not handle stress or changes in routine well. (Id. at 237.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application. (Id. at 243-50.) She did not have any new limitations as a result of her impairments, and had no new illnesses or impairments. (Id. at 245.) Also, there had been no changes, for better or worse, in her impairments since she had last completed a disability report. (Id.)

An earnings report for Plaintiff lists earnings for 1998 to 2000 and 2002 to 2010. (Id. at 185.) Her highest earnings, $13,239, were in 2009. (Id.) She earned $6,570 in 2010; with the exception of the 2009 earnings, these were her highest earnings after 2004. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in May 2007 when Plaintiff consulted Mary S. Campbell, F.N.P.,[5] with Missouri Highland Health Care ("MHHC"), for treatment of earaches, cough, sinus pain, headache, swollen glands, fatigue, and nasal discharge. (Id. at 301-03, 417-19.)

The following month, she had a follow-up appointment with Aaron Trone, D.O., with MHHC, to investigate a split S1 heart sound.[6] (Id. at 300-01, 416.) Dr. Trone opined that the split sound "should be of no consequence" and advised Plaintiff to return as needed. (Id. at

---

[5]Family Nurse Practitioner.

[6]A S1 heart sound is the first sound caused by the closing of the mitral and tricuspid valves. Learn the Heart, S1 Heart Sound, http://www.learntheheart.com/cardiology-review/s1-heart-sound/ (last visited June 17, 2014). A delay in the closure of the tricuspid valve results in a split S1 sound, which can be heard in 40 to 70 percent of normal individuals. Id.

300.)  She returned two weeks later with complaints of a swollen, painful left foot after dropping something on it.  (Id. at 299-300, 415.)  X-rays revealed no fractures.  (Id. at 307, 420.)  She was diagnosed with an abrasion or friction burn of the foot and prescribed Vicodin.[7]  (Id. at 299-300.)

Plaintiff saw Dr. Trone in April 2008 for left flank pain and blood in her urine.  (Id. at 297-99, 308, 413-14.)  Her heart sounds were normal.  (Id. at 298.)  She had tenderness on palpation of the left side of her back.  (Id.)  She was prescribed Bactrim to treat her urinary infection.  (Id. at 299.)

In August, Plaintiff was seen by Michelle Allen, R.N., M.S.N., A.N.P.,[8] with MHHC for back pain that radiated down her legs.  (Id. at 295-97, 411-13.)  The pain had begun after Plaintiff jumped off a bluff into a river when with her children.  (Id. at 295.)  After being examined, Plaintiff was diagnosed with lumbar strain and backache and referred for spinal x-rays and an evaluation for physical therapy.  (Id. at 297.)  The x-rays of her cervical spine were negative.  (Id. at 306, 422.)  X-rays of her lumbar spine revealed a loss of normal lumbar curve and a muscle spasm, but were otherwise normal.  (Id.)

Plaintiff saw Dr. Trone again in January 2009, complaining of left hand and wrist pain she thought might have been caused when she lifted a patient at work.  (Id. at 293-94, 409-

---

[7]Vicodin, a combination of acetaminophen and hydrocodone, is used to relieve moderate to severe pain.  Vicodin, http://www.drugs.com/vicodin.html (last visited June 18, 2014).

[8]"R.N." is a registered nurse; "M.S.N." is a Master of Science in Nursing; and "A.N.P." is Adult Nurse Practitioner.

10.)  She was diagnosed with tendonitis, given a wrist splint to be worn for one to two weeks, and told to return if she did not improve.  (Id. at 294.)

Two months later, Plaintiff saw Ms. Allen for treatment of pelvic pain and pain and a burning feeling when urinating.  (Id. at 291-93, 408-09.)  She was diagnosed with an urinary tract infection, prescribed Bactrim and Pyridium (for the urinary pain and burning[9]), and told to increase her intake of fluids.  (Id. at 293.)

In May, Plaintiff went to the Salem Memorial District Hospital ("Salem Memorial") emergency room with complaints of blood in urine and low back and abdominal pain.  (Id. at 330-37.)  An x-ray of her abdomen revealed calcific densities of an indeterminate nature in her left upper abdomen, which could be renal calculi and for which further evaluation was recommended.  (Id. at 336.)  Plaintiff was discharged and released to return to work in two days if she was well.  (Id. at 337.)

Plaintiff returned to the Salem Memorial emergency room in October with complaints of a low grade fever and was diagnosed with chicken pox.  (Id. at 324-29.)  Eight days later, she saw Dr. Trone, explaining that she needed a note to return to work.  (Id. at 290-91, 407.)  One was given.  (Id. at 291.)

There are no records of any medical treatment for the next six months.

In May 2010, Plaintiff was seen again at the Salem Memorial emergency room for complaints of blood in her urine and left flank pain.  (Id. at 314-23.)  A CT scan of her

---

[9]See Pyridium, http://www.drugs.com/mtm/pyridium.html (last visited June 17, 2014).

abdomen and pelvis revealed an abnormal, enlarged lobulated[10] left kidney with "complex low density areas and calcification." (Id. at 322.) A malignant tumor could not be excluded. (Id.) Further evaluation and a urological consultation was recommended. (Id.) Notations on the CT report indicate that Dr. Trone was faxed a copy of the report on May 11 and a message was left at Plaintiff's home for her to call the emergency room. (Id.)

That same day, Plaintiff saw Dr. Trone about the CT scan results. (Id. at 289-90, 405-06.) It was recommended that she promptly see a urologist. (Id. at 289.) She also complained of continuing left flank pain, and reported that she could not tolerate the side effects from the pain medication. (Id.) She was again prescribed Bactrim and referred to urology. (Id. at 289, 290.)

She consulted a urologist, Anthony T. Kaczmarek, M.D., on May 27. (Id. at 338-42.) She had completed the course of Bactrim and was taking hydrocodone with acetaminophen.[11] (Id. at 338, 339.) A cystoscopy eliminated urinary tract problems as a cause of her hematuria.[12] (Id. at 341.) To investigate the cause further, Plaintiff had an ultrasound and CT scan of her kidneys. (Id. at 310-13, 345-46.) They both revealed a large complex multicystic left renal mass. (Id. at 312-13, 345-46.) Her right kidney appeared to be normal.

---

[10]"Lobulated" is defined as "[d]ivided into lobules," which are small lobes or subdivisions of lobes. Stedman's Medical Dictionary, 992 (26th ed. 1995) (Stedman's).

[11]See note 7, supra.

[12]Hematuria is blood in the urine. Stedman's at 773.

(Id. at 312, 345.)  Someone from Dr. Kaczmarek's office attempted to contact Plaintiff after she did not keep her June 9 appointment to discuss the test results.  (Id. at 346.)

On July 6, Plaintiff went to the Parkland Health Center emergency room with complaints of left-sided abdominal pain and left flank pain with nausea for the past two days.  (Id. at 347-60.)  She was diagnosed with a urinary tract infection, given an intravenous injection of Zofran, which is used to prevent nausea,[13] and was discharged with a prescription for Septra, an antibiotic prescribed to treat infections caused by bacteria.[14]  (Id. at 348, 357, 379.)

On July 29, Plaintiff consulted another urologist, Stephen H. Weinstein, M.D., who scheduled Plaintiff for a left open radical nephrectomy[15] to be performed five days later.  (Id. at 384-92.)  The nephrectomy was performed on August 3 to remove Plaintiff's left renal mass.  (Id. at 364-83.)  The tumor was limited to the left kidney; the margins were free.  (Id. at 381.)  A fragment of her left eleventh rib was examined and found to have no gross abnormalities.  (Id. at 380.)  Four days after the nephrectomy, she was able to tolerate a regular diet, "her pain was well-controlled," and she was discharged with prescriptions for Vicodin, Lovenox (to be injected subcutaneously for five days to prevent blood clots), and Macrodantin.[16]  (Id. at 368, 369, 370.)  She could gradually resume her normal activities, had

---

[13]See Zofran, http://www.drugs.com/zofran.html?utm_expid (last visited June 18, 2014).

[14]See Septra, http://www.drugs.com/septra.html (last visited June 18, 2014).

[15]A nephrectomy is the "[r]emoval of a kidney."  Stedman's at 1183.

[16]Macrodantin is prescribed "[t]o reduce the development of drug-resistant bacteria." Macrodantin, http://www.drugs.com/pro/macrodantin.html (last visited June 19, 2014).

no work restrictions, and was not to lift more than twenty pounds for the next six weeks.  (Id. at 370.)

At an August 18 follow-up visit to Dr. Weinstein, Plaintiff reported that she was taking pain medication only at night.  (Id. at 393-94.)  She was to return in three months for lab work and a chest x-ray.  (Id. at 393.)

There are no records of any medical treatment for the next six months.

Plaintiff saw Laurie Heaps, F.N.P., with MHHC on September 1 to request medication to help her sleep and for her allergies.  (Id. at 403-05.)  She explained that she had had a tumor removed that was attached to her lung and liver.  (Id. at 404.)  She was trying to quit smoking.  (Id.)  Vicodin was her only current medication.  (Id.)  Her mood was depressed.  (Id.)  She was prescribed trazodone, an anti-depressant,[17] and loratadine, an antihistamine,[18] and was to return in six weeks.  (Id. at 405.)

Plaintiff saw Ms. Heaps again on October 7, reporting that she was continuing to have cold symptoms.  (Id. at 402-03.)  She had been given a cough medicine when seen four nights earlier in an emergency room[19] and was now sleeping through the night.  (Id. at 402.)  Before she became sick, the trazodone had been helping to resolve her insomnia.  (Id.)  Plaintiff was diagnosed with acute bronchitis.  (Id. at 403.)  Her prescriptions for trazodone and loratadine

---

[17]See Trazodone, http://www.drugs.com/trazodone.html (last visited June 19, 2014).

[18] See  Loratadine  http://www.drugs.com/loratadine.html  (last  visited  June  19,  2014). Loratadine is the generic form of, inter alia, Claritin.  Id.

[19]The records of that visit are not included in the administrative record.

were renewed; a prescription for doxycycline monohydrate, an antibiotic,[20] and for an aerosol inhaler was added.  (Id. at 402.)

Plaintiff returned to Dr. Weinstein on November 18 for a follow-up appointment.  (Id. at 434-36.)  She reported she was continuing to have left flank pain, which was improving and for which she was taking Motrin.  (Id. at 434, 435.)  Her bladder was functioning well. (Id. at 434.)  She was described as doing well.  (Id. at 435.)

On December 9, Plaintiff saw Ms. Allen to discuss her medications, a nonproductive cough, and headaches.  (Id. at 399-401.)  She explained that her legs ached and her hair was falling out due to the Macrodantin she was placed on after undergoing surgery for cancer of the left kidney, ribs, and liver.  (Id. at 399.)  She was tired and not sleeping well.  (Id.)  The trazodone was not helping.  (Id.)  She had taken her last pain medication the night before. (Id.)  On examination, she was alert, tired, anxious, and in no acute distress.  (Id. at 400, 401.) She had a normal gait and stance.  (Id. at 401.)  Her prescription for trazodone was renewed. (Id.)  Prescriptions for Vicodin, Phenergan with codeine, Ultracet, Ultram, and Vistaril were added.[21]  (Id.)  She was advised to follow-up with her surgeon and oncologist about the

---

[20]See Doxycycline, http://www.drugs.com/doxycycline.html (last visited June 19, 2014).

[21]Ultracet is a combination of tramadol and acetaminophen and is used to treat moderate to severe pain.  Ultracet, http://www.drugs.com/ultracet.html (last visited June 19, 2014).  Ultram "is a narcotic-like pain reliever . . . used to treat moderate to severe pain."  Ultram, http://www.drugs.com/ultram.html (last visited June 19, 2014).  Vistaril is the brand name for hydroxyzine, acts as an antihistamine, and is used to treat anxiety and tension.  Vistaril, http://www.drugs.com/vistaril.html (last visited June 19, 2014).  Phenergan is also an antihistamine. Phenergan, http://www.drugs.com/phenergan.html (last visited June 19, 2014).

symptoms she was experiencing and for further evaluation. (Id.) She said she would call that day. (Id.)

Plaintiff saw Ms. Allen again eight days later, reporting that she was feeling better but experiencing increasing shortness of breath and an elevated pulse with little physical exertion. (Id. at 397-99.) She was diagnosed with myalgia and myositis and primary insomnia. (Id. at 398.) She was to return to the clinic if her symptoms worsened or new ones appeared. (Id.) She was also to have an electrocardiogram ("ECG") and was prescribed Vistaril to be taken as needed for anxiety. (Id. at 399.) An ECG was performed ten days later. (Id. at 423-24.)

Plaintiff consulted Mary Mason, M.D., with Mercy Clinic, on February 16, 2011, for sinus problems, post nasal drip, a sore throat, constant headaches, sporadic chest pain, myalgia, and heartburn. (Id. at 427-32.) She had a normal gait, stance, mood, affect, judgment, and thought content. (Id. at 428.) Her diagnoses included acute sinusitis, for which she was taking amoxicillin; status post nephrectomy; muscle spasms, for which she was taking Skelaxin; chronic bronchitis; tobacco dependence; headaches and leg pain, for both of which she was taking tramadol; generalized anxiety disorder, for which she was taking Vistaril; and gastroesophageal reflux disease ("GERD"), for which she was taking Zantac. (Id. at 428-29.) The medications were renewed. (Id. at 430.) She was to return in three months for refills of her prescriptions. (Id. at 431.)

The next day, Plaintiff saw Dr. Weinstein, reporting that she had occasional left flank pain but no blood in her urine. (Id. at 437-39.) She was to have a chest x-ray and complete

metabolic panel at her primary care physician's and have the results faxed to Dr. Weinstein. (Id. at 437.)

Plaintiff was seen at the Salem Memorial emergency room on April 15 for complaints of a cough with chest pain and vomiting that had begun two days earlier. (Id. at 460-61.) She smoked one pack of cigarettes a day. (Id. at 460.) She was given doxycycline, Tessalon (a non-narcotic cough medicine[22]), prednisone, and Mucinex (an expectorant[23]) and discharged within an hour of arrival. (Id. at 461.)

Six days later, Plaintiff saw Dr. Mason. (Id. at 441-447.) She reported that she smoked half a pack of cigarettes a day, and had done so for sixteen years. (Id. at 441.) She further reported that the medications given her in the emergency room for her acute bronchitis had not helped. (Id. at 442.) She still had a cough. (Id.) Also, she was out of the trazodone prescribed to help her sleep. (Id.) Her behavior was normal, but her mood was anxious. (Id.) She was diagnosed with acute and chronic bronchitis, for which she was prescribed Tussionex PennKinetic,[24] Zithromax,[25] and prednisone. (Id. at 442.) Her prescription for trazodone was renewed, as was her prescription for Skelaxin. (Id. at 443.)

---

[22]See Tessalon, http://www.drugs.com/mtm/tessalon.html (last visited June 19, 2014). Tessalon is a brand name for benzonatate. Id.

[23]See Mucinex, http://www.drugs.com/mucinex.html (last visited June 19, 2014). It is a brand name for guaifenesin. Id.

[24]Tussionex PennKinetic is a combination of chlorpheniramine, an antihistamine, and hydrocodone, a narcotic cough medicine. Tussionex PennKinetic, http://www.drugs.com/mtm/tussionex-pennkinetic.html (last visited June 19, 2014).

[25]Zithromax is an antibiotic. Zithromax, http://www.drugs.com/zithromax.html (last visited June 19, 2014).

The next day, Plaintiff returned to the Salem Memorial emergency room with complaints of shortness of breath at rest and of a cough. (Id. at 462-66.) She had a normal heart rate and a regular heart rhythm. (Id. at 463.) She did not display signs of respiratory distress. (Id.) A chest x-ray showed no evidence of acute cardiopulmonary disease. (Id. at 466.) She advised on discharge that she would get the prescribed antibiotic, doxycycline, as an outpatient. (Id. at 463.)

Plaintiff returned to the emergency room on May 14 with complaints of a rash caused by an acute allergic reaction. (Id. at 467-68.) She was prescribed Benadryl, Zantac, and a Medrol pack and discharged within an hour. (Id. at 467.)

On May 24, Plaintiff consulted Dr. Mason for complaints of a sore throat for the past few days and a cough, which was occasionally productive. (Id. at 454-58.) Plaintiff reported that she was "[s]till pretty sore in area of her nephrectomy scar." (Id. at 454.) On examination, she had a cough, but no nausea. (Id.) She also had a normal gait, stance, mood, affect, behavior, and thought content. (Id.) Her diagnoses were the same as at the February visit. (Id. at 454-55.) She was prescribed Claritin, see note 18, supra, Skelaxin, Zantac, Ultram, Vistaril, and amoxicillin and was to return in three months. (Id. at 457.)

Plaintiff was seen at the emergency room on June 13 for a toothache that had begun the day before. (Id. at 469-70.) She was not short of breath. (Id. at 469.) Her heart and

breath sounds were normal. (Id.) She was prescribed amoxicillin, Vicodin, and acidophilus[26] and was to follow up with her primary care physician when needed. (Id.)

Four days later, Plaintiff saw Dr. Mason for her annual well-woman exam. (Id. at 472-83.) Her depression was doing well on medications and her asthma was controlled with the inhaler. (Id. at 474, 483.) She was smoking half a pack of cigarettes a day and was trying to quit. (Id. at 475.) She did not have, among other symptoms, a cough, shortness of breath, back pain, neck pain, joint pain, chest pain, a sore throat, or anxiety. (Id.) Her gait and coordination were normal. (Id. at 476.) She was encouraged to stop smoking. (Id. at 477.) Also, she wanted to get a dog and, for her apartment management to allow it, needed a letter from her doctor. (Id.)

Plaintiff saw Dr. Mason again in August, complaining of a fever, congestion, sinus drainage, chest pain, shortness of breath, and wheezing. (Id. at 484-89.) Her symptoms were unrelieved by Claritin. (Id. at 484.) She reported she had seen Dr. Weinstein the past week.[27] (Id. at 485.) Plaintiff had a normal gait, posture, mood, affect, behavior, judgment, and thought content. (Id. at 485.) She was prescribed amoxicillin, Ultram, Skelaxin, Zantac, and Vistaril. (Id. at 487.) She was to return in three months. (Id. at 488.)

Plaintiff returned in one month, reporting the Claritin did not help and she could not afford Mucinex. (Id. at 281-82.) She continued to have congestion and sinus drainage. (Id.

---

[26]Acidophilus "helps maintain an acidic environment in the body" and is used to treat urinary tract and yeast infections. Acidophilus, http://www.drugs.com/mtm/acidophilus.html (last visited June 19, 2014).

[27]There are no records from that visit included in the administrative record.

at 281.)  Dr. Mason noted that they were waiting on a pathology report from her nephrectomy to send to a local oncologist.  (Id.)  Plaintiff had a normal gait, posture, mood, affect, judgment, and thought content.  (Id. at 281-82.)

Two days later, she saw Dr. Mason for problems with an abscessed tooth and was prescribed Augmentin.  (Id. at 280.)  The same day, she consulted Patsy Copling, F.N.P, in the same clinic as Dr. Mason to discuss treatment to help her stop smoking.  (Id. at 277-79.)  Her diagnoses included tobacco dependence, chronic bronchitis, environmental allergies, and cancer of the kidney.  (Id. at 279.)  She was prescribed Chantix to help her stop smoking.  (Id.)

Plaintiff saw Dr. Mason in October for complaints of gastrointestinal upset, diarrhea, and draining sinuses for the past four days.  (Id. at 276-77.)  She had a fever, congestion, a cough, nausea, and shortness of breath; she was fatigued.  (Id.)  She also had a normal gait, posture, mood, affect, judgment, and thought content.  (Id. at 277.)  She was diagnosed with acute sinusitis, insomnia, headaches, leg pain, muscle spasm, chronic bronchitis, and myalgia and myositis.  (Id.)  She was prescribed Keflex (an antibiotic[28]), Mucinex, Desyrel (a brand name for trazodone), Ultram, Skelaxin, and Vicodin.  (Id.)

In November, when seeing Plaintiff, Dr. Mason noted that she had applied for disability based on her kidney cancer, depression, anxiety, and pain.  (Id. at 275-76.)  Plaintiff reported having pain in all her muscles, particularly on the left.  (Id. at 275.)  The pain kept her from doing physical work and a lot of household chores.  (Id.)  Her memory and

---

[28]See Keflex, http://www.drugs.com/keflex.html (last visited June 19, 2014).

concentration were "pretty good." (Id.) Her nerves, however, were bad when she had to deal with people. (Id.) On examination, she had a normal gait, posture, mood, affect, judgment, and thought content. (Id. at 276.) She reported having tenderness with palpation around the upper portions of the scar on her left flank. (Id.) She was diagnosed with musculoskeletal pain, chronic bronchitis, generalized anxiety disorder, and status post nephrectomy. (Id.) Dr. Mason filled out the requested paperwork for Plaintiff's disability applications.[29] (Id.)

Plaintiff next saw Dr. Mason on February 2, 2012. (Id. at 274-75.) She reported that she was "[d]oing well in general," but was "[h]aving lots of runny nose, sinus drainage, ear pain" and headaches. (Id. at 274-75.) The week before she had had nausea and vomiting, but no longer had either. (Id. at 274.) She was not in distress and had a normal mood, affect, judgment, and thought content. (Id. at 274, 275.) Her gait and posture were also normal. (Id. at 275.) She was diagnosed with acute sinusitis, external otitis, myalgia and myositis, muscle spasms, headaches, leg pain, and chronic bronchitis. (Id.) Plaintiff was prescribed Vicodin, Skelaxin, Ultram, and an inhaler, Proair. (Id.)

Plaintiff returned to Dr. Mason on February 24 with complaints of sinus congestion and cough with associated abdominal pain and headaches. (Id. at 273-74.) Plaintiff further reported that Chantix gave her severe headaches. (Id. at 273.) On examination, she had a cough, congestion, light-headedness, headaches, and abdominal and back pain. (Id.) Dr. Mason diagnosed Plaintiff with generalized anxiety disorder, acute sinusitis, cough, chronic

---

[29]See page 20, infra.

bronchitis, and nicotine dependence. (Id. at 274.) She prescribed her Vistaril and Wellbutrin, an antidepressant. (Id.)

Also before the ALJ were assessments of Plaintiff's mental and physical impairments and their resulting limitations.

In October 2010, a consultant, Jean Diemer, M.D., reviewed the records of Plaintiff's nephrectomy and opined that the findings of renal cell carcinoma did not meet or equal the listings. (Id. at 395.) She noted that there was no evidence of lymphatic invasion or metastatic disease. (Id.)

In November 2011, Dr. Mason completed a Medical Source Statement – Physical on Plaintiff's behalf. (Id. at 491-93.) She assessed Plaintiff as having the ability to occasionally lift or carry ten pounds; to frequently lift or carry five pounds; to stand or walk for a total of three hours during an eight-hour day and do either continuously for ten to fifteen minutes; and to sit for a total of three to four hours in an eight-hour day and do so continuously for twenty minutes. (Id. at 491.) Her ability to push or pull was limited by the severe pain in her side. (Id.) She should never climb, balance, stoop, kneel, crouch, or bend. (Id. at 492.) Her ability to reach was limited. (Id.) Her abilities to handle, finger, feel, see, hear, and speak were not limited. (Id.) She should avoid temperature extremes and perfume. (Id.) The bases for Dr. Mason's assessment was "primarily" Plaintiff's history. (Id. at 493.) Plaintiff's pain was centered around her nephrectomy scar and was consistent with pain described by other patients who had undergone similar surgery. (Id.) Rest would be helpful to Plaintiff. (Id.) She should assume a reclining position for up to thirty minutes one to three times a day and

assume a supine position with the same frequency and duration.  (Id.)  She did not need to prop her legs up.  (Id.)

The same month, as directed by the ALJ, see note 2, supra, Plaintiff underwent a psychological evaluation by Lauretta V. Walker, Ph.D., a clinical psychologist.  (Id. at 494-501.)  She described three marriages, each to an abusive man and each ending in divorce.  (Id. at 494.)  She was currently in a relationship with a policeman.  (Id. at 495.)  She has had problems with urinary tract infections since she was a child.  (Id.)  She has also always had headaches.  (Id.)  She had been treated at University Hospital, but was not told until being discharged that the immediate surgery she had had to undergo was for cancer.  (Id.)  She is still seeing the doctor who performed the surgery; however, he keeps changing his mind about how long she has to see him.  (Id.)  She sees her primary care physician for her emotional problems.  (Id.)  She gets help from attendants three hours and forty-five minutes a day.  (Id.)  Her two youngest children live with her.  (Id.)  She has a friend who visits and she visits her mother.  (Id. at 495.)

During the evaluation, Plaintiff "seemed rather anxious and jittery."  (Id. at 496.)  Her thoughts were coherent and goal directed, although she had to be interrupted in order to "move along" when going into minute detail.  (Id.)  "No unusual behaviors were noted."  (Id.)  She reported that she is able to sleep and wakes up only twice a night due to an increased dosage of trazodone.  (Id.)  She also sleeps during the day.  (Id.)  She is not as active as she used to be.  (Id.)  She used to be a Boy Scout leader because she likes children; however, she stopped because the children were getting on her nerves and irritating her.  (Id.)  Her mood

depends on the kind of day she is having. (Id.) For instance, the night before, she became upset and started throwing things because she could not help her son with his math homework. (Id.) On a scale from one to ten, with one being very depressed, her mood was usually a three. (Id.) She often did not want to shower and cannot concentrate to read. (Id.) Her frequent dreams are of people hurting her children. (Id.) On examination, she was oriented in all areas, but did not know what direction the sun came up or how many weeks in a year. (Id.) She could name the last two presidents, but not the third. (Id.) She could explain simple proverbs; for instance, if finding an envelope, she would take it to the post office. (Id.) She could recall the name of one of her grade school teachers. (Id.) She could repeat five digits forward, but only two backwards. (Id.) She said she guessed the answers on the driver's test. (Id.) Dr. Walker opined that Plaintiff was in the borderline range of intelligence. (Id.) She asked Plaintiff why she could not work. (Id. at 497.) Plaintiff replied that she hurt "a lot" and slept "a lot." (Id.) Also, "with everything that ha[d] happened she [did not] want to be around people." (Id.) She cried a lot, but did not want people to see her cry. (Id.)

Dr. Walker diagnosed Plaintiff with bipolar II disorder, undifferentiated somatoform disorder, and personality disorder not otherwise specified with borderline and dependent features. (Id.) She rated Plaintiff's current Global Assessment of Functioning ("GAF") as 51.[30] (Id.) Dr. Walker further opined that Plaintiff was "extremely focused on her medical

[30]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir.

condition." (Id.) Dr. Walker did not, however, sense any urgency from the medical information sent her and thought it possible that Plaintiff misunderstood things and focused on negatives. (Id.) She could "understand and follow simple directions most of the time," but had trouble making decisions. (Id.) She did not like change, to be around a lot of people, "or to be told what to do in certain tones." (Id.)

Dr. Walker also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff. (Id. at 499-501.) She assessed Plaintiff as having marked limitations in her abilities to understand, remember, and carry out complex instructions and in her ability to make judgments on complex work-related decisions. (Id. at 499.) Her limitations were moderate when those instructions and decisions were simple. (Id.) She had moderate limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting and had mild limitations in her abilities to interact appropriately with the public, coworkers, and supervisors. (Id. at 500.) Asked to identify the objective evidence supporting her assessment, Dr. Walker repeated what Plaintiff said about herself and noted that any stress "likely increases physical complaints." (Id.) There were no other capabilities affected by Plaintiff's impairments. (Id.)

## The ALJ's Decision

---

2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

The ALJ first determined that Plaintiff met the insured status requirement of the Act through December 31, 2005, and had not engaged in substantial gainful activity since her alleged onset date of March 15, 2010.  (Id. at 12.)  Although she had worked after that date, the work lasted less than three months and was an unsuccessful work attempt.  (Id.)

The ALJ next found that Plaintiff had severe impairments of multicystic kidney disease; status post left nephrectomy; and bipolar II disorder.  (Id. at 13.)  She also had non-severe impairments of asthma, headaches, muscle spasms, leg pain, myalgia, and myositis.  (Id.)  The ALJ noted that there was no objective medical evidence to support the diagnosis of myalgia.  (Id.)  Plaintiff did not have, however, an impairment or combination thereof that met or medically equaled an impairment of listing-level severity.  (Id.)  Specifically, her kidney cancer was not "inoperable, unresectable, or recurrent, or shown to have metastasized to or beyond the regional lymph nodes . . . ."  (Id. at 13-14.)  Her mental impairments did not satisfy the listing criteria because she did not have marked limitations in two of the three areas or have repeated episodes of decompensation of extended duration and marked limitations in one of the areas.  (Id. at 14.)  Instead, she had moderate restrictions in her activities of daily living; mild difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace.  (Id.)  She had not experienced any episodes of decompensation of extended duration.  (Id. at 15.)

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with additional restrictions of (a) avoiding concentrated exposure to temperature extremes, humidity, and irritants; (b) avoiding unprotected heights and hazardous

machinery; and (c) performing simple routine tasks with only occasional decision making and changes in the work setting. (Id.) In arriving at this determination, the ALJ assessed Plaintiff's credibility and found her not to be entirely credible. (Id. at 16-18.) After summarizing Plaintiff's testimony, the ALJ noted that she lived with and was the primary caregiver for her two minor children; had a driver's license and could drive a car; had at least one friend; and had had a boyfriend for five years. (Id. at 17.) There was no objective medical evidence to support a finding her symptoms had worsened. (Id.) She had not been given any work-related restrictions other than those imposed after her nephrectomy. (Id.) Her primary care physician noted that her pain was consistent with that experienced by other nephrectomy patients. (Id.) Despite her complaints of muscle spasms, leg pain, and headaches, she consistently had a normal gait and posture and a full range of motion in her back and extremities. (Id.) Although she had been diagnosed with depression and anxiety and had been prescribed medication for such, she had not alleged a mental impairment and had not sought any treatment from a mental health professional. (Id.) Moreover, her mood, affect, and thought content were usually normal and there were only a few occasions when she was noted to be anxious or depressed. (Id.)

After reviewing Dr. Walker's report, the ALJ gave her opinion partial weight, noting that she had examined Plaintiff on only one occasion and had relied on Plaintiff's statements for some of her conclusions. (Id. at 18.) She did find merit to Dr. Walker's opinion restricting Plaintiff to simple routine tasks and occasional decision making and changes in the work setting. (Id.) These limitations were included in the ALJ's RFC findings. (Id.) The

opinion of Dr. Mason was given little weight as it was not supported by Dr. Mason's own treatment notes, was based on the history provided by Plaintiff, and was inconsistent with other substantial evidence. (Id.) Insofar as Dr. Mason imposed some breathing and temperature restrictions, those restrictions were incorporated in the RFC. (Id.) Also considered were some of the exertional limitations found by Dr. Mason. (Id.) The opinion of Dr. Diemer was "given great weight" only as to the evidence before October 2010. (Id. at 19.)

With her RFC, Plaintiff can not perform her past relevant work. (Id.) With her age, limited education, and RFC, she can perform jobs existing in significant numbers in the national economy as described by the VE. (Id. at 19-20.) The ALJ concluded that Plaintiff is not disabled within the meaning of the Act. (Id. at 20.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)[31]). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

---

[31]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the revision in effect at the time of the ALJ's decision.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

### Discussion

Plaintiff argues that the ALJ erred (1) when failing to give Dr. Mason's assessment controlling weight and (2) in his assessment of her nonexertional limitations, such conclusions not being supported by Dr. Walker's findings. The Commissioner disagrees.

Dr. Mason's Assessment.  As noted above, when seeing Plaintiff in November 2011, Dr. Mason completed a Medical Source Statement ("MSS").  She assessed Plaintiff as having the ability to occasionally lift or carry ten pounds; to frequently lift or carry five pounds; to stand or walk for a total of three hours during an eight-hour day and do either continuously for ten to fifteen minutes; to sit for a total of three to four hours in an eight-hour day and do so continuously for twenty minutes; to have a limited ability to push or pull due to severe pain in her side; to have a limited ability to reach; and to have unlimited abilities to handle, finger, feel, see, hear, and speak.  She should not climb, balance, stoop, kneel, crouch, or bend and should avoid temperature extremes and perfume.  She should assume a reclining position for up to thirty minutes one to three times a day and assume a supine position with the same frequency and duration.  The ALJ discounted this assessment on the grounds that it was not supported by Dr. Mason's treatment notes, was based on the history provided by Plaintiff, and was inconsistent with other substantial evidence.

It is undisputed that Dr. Mason was Plaintiff's treating physician beginning in February 2011.  See 20 C.F.R. §§ 404.1502, 416.902 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant].").  It is clear from the record, however, that Dr. Mason's treatment of Plaintiff usually focused on respiratory problems.  For instance, Plaintiff first consulted Dr. Mason for acute sinusitis; the next visit was for acute bronchitis; the third visit was for a sore throat and cough; the next visit, after her annual well-woman exam, was for a

fever, congestion, sinus drainage, chest pain, shortness of breath, and wheezing; the fifth was for congestion and sinus drainage; and the next, following a visit for an abscessed tooth, was for gastrointestinal upset, diarrhea, and draining sinuses. It was after this visit that Plaintiff asked Dr. Mason to complete paperwork for her disability applications. At the contemporaneous visit, she complained of muscle pain that kept her from doing physical work and household chores. She also complained of having bad nerves when she had to be around people. The day after first seeing Dr. Mason, Plaintiff informed Dr. Weinstein, the surgeon who had performed the nephrectomy, that she had *occasional* left flank pain. At her third visit to Dr. Mason, Plaintiff reported that she was "pretty sore" at the nephrectomy site. (R. at 454.) There is no other mention relative to Plaintiff's nephrectomy until the November 2011 visit during which she asked Dr. Mason to complete the paperwork. There are, however, consistent references in Dr. Mason's treatment notes to Plaintiff having a normal gait, stance, mood, affect, judgment, and thought content.

Dr. Mason's assessment of Plaintiff's exertional limitations is clearly inconsistent with her own treatment notes.[32] "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is

---

[32]In her reply brief, Plaintiff takes issue with the ALJ's incorporating some of the environmental limitations, e.g., avoiding exposure to temperature extremes, found by Dr. Mason while not adopting all the limitations. Dr. Mason's treatment notes consistently refer, however, to Plaintiff having respiratory problems. Plaintiff's argument that the ALJ must adopt all or none of Dr. Mason's limitations is without authority and merit.

inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Turpin v. Colvin**, 750 F.3d 989, — , 2014 WL 1797396, *3 (8th Cir. 2014). See also **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about claimant's exertional limitations that "[were] not reflected in any treatment notes or medical records").

This lack of support in her treatment notes for Dr. Mason's assessment of Plaintiff's exertional abilities underscores the extent to which she based that assessment on Plaintiff's own descriptions. Indeed, Dr. Mason explained in her assessment that the limitations therein were primarily based on Plaintiff's report. An ALJ may discount a treating physician's opinion that is based on the claimant's subjective complaints. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **McCoy**, 648 F.3d at 617 (holding ALJ did not err in discrediting mental RFC assessment of neurologist that was based, "at least in part, on [claimant's] self-reported symptoms" which had been "found to be less than credible"); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence). In the instant case, the ALJ found that Plaintiff was not credible. "'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting

Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). Plaintiff does not challenge this finding.

Another consideration detracting from the weight to be given Dr. Mason's assessment is its lack of support in the record as a whole. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

When discharged in August 2010 following her left open radical nephrectomy, Plaintiff was released by Dr. Weinstein to gradually resume her normal activities, return to work without restrictions, and to not lift anything heavier than twenty pounds. When she saw him for a follow-up visit two weeks later, she reported she was taking pain medication only at night. When again seeing Dr. Weinstein, in November 2010, Plaintiff complained of continuing left flank pain but was taking only over-the-counter pain medication. See **Moore**,

572 F.3d at 525 (affirming ALJ's decision that claimant who took over-the-counter pain medication did not suffer disabling pain). She next saw Dr. Weinstein in February 2011, reporting only occasional left flank pain. This was the day after she saw Dr. Mason and was observed to have a normal gait and stance.

Also when seeing Drs. Mason and Weinstein, Plaintiff was seen at the Salem Memorial emergency room four times. The first time was for a cough with chest pain and vomiting; she was discharged within an hour. Seven days later, she returned with complaints of shortness of breath and a cough; chest x-rays were normal. Another time was for a rash caused by an allergic reaction. Another time was for a toothache. None of the four visits were for pain caused by any exertional activities.

Another consideration detracting from the weight to be given Dr. Mason's assessment is its checklist format. See **Anderson**, 696 F.3d at 794 ("[A] conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little or no elaboration.") (internal quotations omitted); see also **Johnson v. Astrue**, 628 F.3d 991, 994 (8th Cir. 2011) (finding that an ALJ may properly reject treating physician's opinion consisting only of checkmarks).

In her opening and reply briefs, Plaintiff cites her kidney cancer and pain at the nephrectomy site in support of Dr. Mason's assessment, noting Dr. Mason's observation that the pain was consistent with that reported by others who have undergone similar surgery. "'As is true in many disability cases, [however,] there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is.'" **Perkins v. Astrue**, 648 F.3d 892, 901 (8th

Cir. 2011) (quoting Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). And, Plaintiff cites to no listing satisfied by the diagnosis of kidney cancer and the subsequent removal of her kidney. "The claimant bears the burden of demonstrating that [her] impairment matches all the specified criteria of a listing." **McDade v. Astrue**, 720 F.3d 994, 1001 (8th Cir. 2013). As noted by Dr. Diemer, the cancer had not metastasized or invaded the lymph nodes. See **McCoy**, 648 F.3d at 611-12 ("Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify.") (quotation omitted). See also **Jones v. Astrue**, 2008 WL 4378444, *14 (E.D. Mo. Sept. 23, 2008) (affirming ALJ's decision finding that kidney cancer and subsequent radical nephrectomy were not ongoing impairments in case in which claimant returned to full activity after nephrectomy and complained only of pain at the incision site). It is apparent from the record that Plaintiff erroneously informed some providers that the cancer had spread to her liver and lungs. It is also apparent from Dr. Mason's repeated references in her treatment notes to her unsuccessful attempts to get the records of Plaintiff's nephrectomy, see Record at 281, 455, 485, that she did not know of the extent to which Plaintiff's kidney cancer had spread. Thus, a diagnosis of kidney cancer does not support an otherwise problematic assessment. Nor does the presence of pain establish a disabling impairment. See **Palmer v. Astrue**, 2013 WL 3810901, *13 (E.D. Mo. July 22, 2013) ("[P]ain is a symptom, not a medically determinable impairment.").

Plaintiff's RFC.  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.  RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*."  S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted).  Plaintiff argues that the ALJ did not follow this standard when finding she has the RFC to perform simple routine tasks with only occasional decision making and occasional changes in the work setting.  Rather, Dr. Walker found that she could understand and follow simple directions only "*most* of the time."  (R. at 497; emphasis added.)

"Generally, if a consulting [psychologist] examines a claimant only once, his or her opinion is no considered substantial evidence . . . ."  **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004).  "However, 'an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.'"  **Id.** (quoting Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004)).  In the instant case, the ALJ did not err in finding Plaintiff could perform simple routine tasks although Dr. Walker impliedly limited that ability to only "most of the time."  When completing a Function Report, Plaintiff reported that her impairments did not affect her ability to follow instructions or concentrate.  She further reported that she can follow written and spoken instructions.  Neither in her testimony nor elsewhere did Plaintiff cite a mental inability to perform tasks as a reason she could not work.  Rather, as when applying for DIB and SSI, she cited physical problems.

Plaintiff cites the holding of **Pate-Fires v. Astrue**, 564 F.3d 935, 947 (8th Cir. 2009), that the claimant's "minimal daily activities, consisting primarily of watching TV, [were] consistent with chronic mental disability," in support of her claim that the ALJ failed to point out how her activities of caring for minor children, driving a car, and having a friend and boyfriend demonstrate that she can perform simple work on a sustained basis. Plaintiff's reliance on *Pate-Fires* is unavailing. The claimant in that case had "a long history of mental disorders . . . and ha[d] been hospitalized on numerous occasions for psychotic episodes." **Id.** Plaintiff did not allege a mental impairment when applying for DIB and SSI and had not sought counseling or psychiatric treatment. Nor was there any evidence that she had been hindered in her performance of any previous jobs by a mental disorder.

Plaintiff further argues that the ALJ's consideration of Dr. Walker's assessment is flawed because he did not address her finding that Plaintiff was within the borderline range of intellectual functioning and was limited in memory. This argument is also unavailing for two reasons., First, Dr. Walker did not *find* that Plaintiff was within the borderline range, she opined so without doing any intelligent quotient ("IQ") testing. Although Plaintiff left school in the ninth grade and had been in special education classes, see Record at 203, she did not cite any IQ-related impairments when applying for DIB and SSI, when testifying, when completing the various forms, or when consulting health care providers. Indeed, the only time Plaintiff's intelligence is at issue is when she was seen for a psychological evaluation at the ALJ's instigation. And, she had been able to complete the training to be a CNA. See **Nicola v. Astrue**, 480 F.3d 885, 887 (8th Cir. 2007) ("A diagnosis of borderline intellectual

functioning should be considered severe *when the diagnosis is supported by sufficient medical evidence*.") (emphasis added).  Second, Dr. Walker's opinion of Plaintiff's intellectual functioning was based on her responses to various questions and tests, e.g., remembering three words after five minutes.  When seeing Dr. Mason in November 2011 – the same month of Dr. Mason's MSS – Plaintiff described her memory and concentration as "pretty good." (R. at 275.)  She did not list her memory or ability to concentrate as abilities adversely affected by her impairments.  She testified she had problems remembering to take her medications, but could not explain how she could then perform a job, that of a CNA, that required her to remember when patients needed to take their medications.  Moreover, the Court finds it disingenuous that she, at age thirty-six, could remember the name of a grade school teacher but not know the number of weeks in a year or in what direction the sun arose.

"Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013).  For the reasons set forth above, Plaintiff has failed to carry this burden. **McNamara v. Astrue**, 590 F.3d 607, 611-12 (8th Cir. 2010) (claimant's failure to testify about any work-related limitations caused by allegedly disabling condition undermined claim)

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir.

2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  26th  day of June, 2014.